# EXHIBIT 1

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**International Arbitral Tribunal**

| | | |
|---|---|---|
| **Tex-Isle Supply, Inc.** | § | |
| **Claimant,** | § | **ICDR Case No. 01-20-0015-5404** |
| v. | § | |
| **Tecnotubi S.p.A. and Alessio Tubi S.p.A.** | § | |
| **Respondents.** | § | |

---

# FINAL AWARD

**May 31, 2023**

## TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................ 1

II. THE PARTIES........................................................................................... 1

III. THE PARTIES' ARBITRATION AGREEMENT ........................................................ 2

IV. FACTUAL BACKGROUND.......................................................................... 3

A. Alessio Produces the Pipe Pursuant to Strict Quality Controls ......................................... 4

B. Upon Receiving the Pipes, Tex-Isle Traced Them Through to Delivery to End Users...... 5

C. Tex-Isle Customers Report Pipe Failures ........................................................ 7

D. The Parties' Dispute Arises ......................................................................... 8

V. PROCEDURAL BACKGROUND.................................................................... 10

VI. THE PARTIES' CLAIMS ............................................................................ 13

VII. REASONS FOR THE FINAL AWARD........................................................... 13

A. Alessio is Not a Party to the Purchase Order........................................................ 13

B. The Pipe That Tex-Isle Contends Alessio Manufactured Was Defective ....................... 15

C. The Defective Pipe Was Manufactured By Alessio ................................................ 16

D. Tecnotubi Breached the Purchase Order.............................................................. 19

E. Tecnotubi Is Liable for Tex-Isle's Foreseeable Damages ......................................... 19

F. Damages Stemming from Tex-Isle's Settlement with EOG.......................................... 21

G. Tex-Isle's Damages Are Reduced by the Amount of its Insurance Recovery ................ 24

H. Interest............................................................................................... 25

I. Legal Fees and Costs; Costs of the Arbitration; AAA/ICDR Fees; Arbitrator Compensation ............................................................................................. 26

VIII. FINAL AWARD.................................................................................... 27

We, THE UNDERSIGNED ARBITRATORS, having been appointed in accordance with the arbitration agreement dated October 28, 2020, which was submitted to the International Centre for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), and administered under its Commercial Rules, as fully described below and having been duly sworn, and having duly heard the proofs and arguments of the Parties, hereby render this our FINAL AWARD as follows.

## I. INTRODUCTION

1. Claimant Tex-Isle Supply, Inc. ("Claimant" or "Tex-Isle"), a Texas pipe distributor to the oil and gas industry, entered into a contract with Respondent Tecnotubi S.p.A. ("Tecnotubi"), an Italian pipe manufacturer, to supply it with pipes manufactured by Tecnotubi's sister company, Respondent Alessio Tubi S.p.A. ("Alessio") (Tecnotubi and Alessio are collectively "Respondents"). Tex-Isle alleges that some of the pipes manufactured by Alessio failed when tested by the Tex-Isle customers who purchased the pipes. Tex-Isle seeks to be compensated for its losses due to these failures. A dispute has arisen between the parties because the Respondents deny that the pipes that failed were manufactured by Alessio. The Respondents contend, among other things, that the pipes Alessio manufactured met all specifications and were free from defects, and, further, that Tex-Isle has failed to establish that the pipes that failed were manufactured by Alessio.

2. The parties' contract contained an agreement to arbitrate, pursuant to which Tex-Isle initiated this arbitration. For the reasons set forth below, the Tribunal finds that Tecnotubi breached the contract and is therefore liable to Tex-Isle for an award of damages.

## II. THE PARTIES

3. Tex-Isle is a Texas corporation based in Houston, Texas which distributes steel pipe to customers in the oil and gas industry. Tex-Isle purchases steel pipe from third-party manufacturers, performs certain value-adding functions like treating and coating the pipe, and sells the pipe to end-customers for use in oil and gas pipelines or production activities. Tex-Isle's principal place of business is located at 10000 Memorial Drive, Suite No. 600, Houston, Texas 77024, USA.

4. Tex-Isle is represented in this arbitration by:

William C. Petit, Esq.
Jennifer C. Barks, Esq.
Kelley Drye & Warren LLP
515 Post Oak Blvd, Suite 900
Houston, Texas 77027 USA

and

Levi M. Downing, Esq.
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007 USA

5. Tecnotubi is an Italian manufacturer of steel pipes with diameters that range from 33.7 mm to 219.1 mm and with a thickness that ranges up to 8 mm. Witness Statement of Michele Amenduni ("Amenduni WS") ¶ 7. Alessio is an affiliate of Tecnotubi that produces larger steel pipes with diameters that range from 33.7 mm to 508 mm, and with a thickness of 12.5 mm. *Id.* ¶ 8. Tecnotubi and Alessio are leaders in the international steel pipe manufacturing industry. *Id.* ¶ 9. The two companies are separate corporate entities that are owned by Gruppo Amenduni Tubi Acciaio and Ferrotubi e Derivati SRL of Carugate (Milano), Italy. *Id.*, ¶¶ 10-12. Tecnotubi's principal place of business is located at Via Mazzini 240/242, Alfianello (Brescia), Italy. Alessio's principal place of business is located at Strada Nizza, 10040 La Loggia (Torino), Italy

6. Respondents are represented in this arbitration by:

Steven D. Isser, Esq.
Law Offices of Steven D. Isser
305 Broadway, 7th Floor
New York, New York 10007 USA

## III. THE PARTIES' ARBITRATION AGREEMENT

7. This arbitration is conducted pursuant to an agreement to arbitrate between the parties. As set forth more fully below, Tex-Isle and Tecnotubi entered into a purchase order incorporating the Toyota General Terms and Conditions for Purchase which contains an arbitration clause:

> APPLICABLE LAW AND ARBITRATION. This Purchase Order, the Contract and any contracts relating hereto or formed hereunder, unless otherwise stipulated or agreed to in writing, shall be construed according to and governed by the internal laws of the State of New York and without the application of any presumption against a party as draftsman. Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration in the City of New York, New York, in accordance with the Commercial rules of the American Arbitration Association and judgment upon the award rendered by the Arbitrator(s) may be entered in any court have jurisdiction thereof. The award of the Arbitrator(s) shall be made in writing and shall contain the reasons

> or grounds therefore. The Arbitrator shall not have the power to award consequential or incidental damages as against Buyer.

Toyota General Terms and Conditions for Purchase, p.3.

## IV. FACTUAL BACKGROUND

8. Tex-Isle first ordered pipe from Tecnotubi in June, 2018. On September 20, 2018, Maura Accini of Tecnotubi sent Tecnotubi's "official offer" to Tex-Isle for 100,000 feet of line pipe. Email from M. Accini to R. Smithey, September 20, 2018 (Cl. Ex. 8).

9. On September 27, 2018, Todd Rae of Toyota Tsusho America, Inc.'s ("Toyota"), Tex-Isle's trading agent, emailed Tecnotubi stating in relevant part: "At your earliest convenience, please email an offer addressed to Toyota Tsusho America, we need this for our internal documentation requirements." Email from T. Rae to M. Accini, September 27, 2018 (Cl. Ex. 9).

10. On October 3, 2018, Mr. Rae emailed Tecnotubi with the message "Please find the TAI PO attached for your records." Email from T. Rae to M. Accini, October 3, 2018 (Cl. Ex. 11). Attached to the email is a one-page Toyota "Purchase Order" bearing "P.O. Number 20482387," indicating "TECNOTUBI SPA" as the supplier, and listing pipe specifications and shipment details, among other things (the "Purchase Order"). Cl. Ex. 11 p. 3. The Purchase Order called for pipe in the following product sizes and quantities: (1) 50,000 feet of 12 3/4" x .250" pipe; (2) 25,000 feet of 12 3/4" x .375" pipe; and (3) 25,000 feet of 16" x .375" pipe. *Id.* The Purchase Order contained the following reference: "API-5L, 45th Edition in accordance with PSL2 requirements." *Id.* It also stated that, "By accepting this Purchase Order, Supplier acknowledges that it has read and accepted Buyer's terms and conditions of purchase…". *Id.*

11. As noted in the Partial Final Award, the Toyota General Terms and Conditions for Purchase ("T&Cs") are incorporated by reference in the Purchase Order, and therefore form part of the parties' contract. The Partial Final Award is discussed in more detail *infra* at ¶¶ 44-45.

12. In the Purchase Order, Tecnotubi warrants that, "[i]n addition to any other warranties provided by law or otherwise," the pipe:

> . . . shall: (i) be first quality, new production and conform to [the] Purchase Order in all respects; (ii) conform to all specifications, drawings samples, descriptions furnished and/or specified by Buyer; (iii) be merchantable and fit for the purpose for which intended; and (iv) be free from all defects in design and workmanship.

The Purchase Order also provides that:

> In the event of a breach of warranty, in addition to all other remedies hereunder or under applicable law or in equity, Buyer may: (i) cancel all or any portion of this Purchase Order; (ii) require the Seller to repair or replace any or all Products, at Buyer's option and at Seller's sole expense; (iii) return nonconforming Products to Seller and request that Seller investigate the nonconformity and submit an action plan to Buyer to correct the nonconformity in a timely manner, at Seller's sole cost and expense; (iv) require the Seller to pay all transportation and other charges arising from delivery, storage or return of Products; and/or (v) purchase replacement Products from a Third Party and charge the same to Seller.
>
> All warranties of Seller, express and implied, and remedies of Buyer, in this Section or elsewhere, shall survive the delivery, inspection, testing, acceptance and payment for the Products.

Purchase Order, p. 2 (TEX-0001529)

13. On the third and final page of the T&Cs, there is, among other things, the arbitration clause that the Tribunal determined in the Partial Final Award governs this arbitration. *See* Section III, *supra*.

**A. Alessio Produces the Pipe Pursuant to Strict Quality Controls**

14. Tecnotubi employees managed Tex-Isle's order. Amenduni WS ¶ 14. The type of pipes ordered are not manufactured by Tecnotubi, however, so Tecnotubi turned over production to Alessio. Id. ¶¶ 13-14. Tecnotubi paid Alessio for the production, withholding a brokerage fee. Id. ¶ 14. Alessio manufactured pipe for Tex-Isle's order.

15. Alessio has been certified by API since 1982. Tr. 655:20-21 (Amenduni). It has been audited by API on a near annual basis, and has never had its certification revoked or suspended. Tr. 656:7-13 (Amenduni).

16. Alessio maintains a 70-page Quality Manual that sets out the procedures its employees follow to ensure the quality of the pipes it produces. Witness Statement of Ugo Giordanino ("Giordanino WS") ¶ 7; JX 137. According to Alessio's Quality Manager, Mr. Ugo Giordanino, Alessio created and followed a "control plan" that sets out the process for producing the pipes at issue in this arbitration. Giordanino WS ¶ 11; JX 138. The pipes were produced as follows:

a. Rolled steel coils are received and inspected. Giordanino WS ¶ 12.
b. The coils are cut into strips of the proper widths to produce the pipes. *Id.*

c. The strips are loaded onto a profiling line, on which the pipe is formed and the seam welded. *Id.*
d. The pipes are cut to size and the ends beveled. *Id.*

17. Once made, the pipes were subjected to an array of procedures to ensure that they did not contain flaws and so they met the specifications required. Mr. Giordanino and the Alessio plant manager, Mr. Giovanni Conte, testified that Tex-Isle pipes were subject to all of these tests, and that these included "destructive" and "non-destructive" tests. The destructive test consists of pumping water into every pipe at the pressure required by the API-5L, 45th Edition specifications (the "API-5L standard"). Giordanino WS ¶13. Respondents provided uncontested testimony that every pipe Alessio manufactured pursuant to the Purchase Order passed this test. Conte WS ¶ 15.

18. Alessio subjected the pipes it manufactured to three non-destructive tests. First, magnetic flux leakage testing to detect any imperfections in the pipes. Giordanino WS ¶ 14. Second, ultrasonic tests were performed on the heads of the pipes. *Id.* Third, laboratory tests were performed on samples taken from the production line. These included tensile, impact and chemical analysis flattening tests. Respondents provided uncontested testimony that every pipe Alessio manufactured pursuant to the Purchase Order passed all of the non-destructive tests. Giordanino WS ¶¶ 15, 22. Conte WS ¶ 15.

19. Finally, pursuant to API-5L, two pipes per casting were subjected to a chemical analysis of their composition, which is also mandated by API-5L. Conte WS ¶ 19. The chemical composition of the pipes manufactured by Alessio was within the ranges required by API-5L. *Id.* Alessio's trained line operators also conducted visual inspections of the pipes at all stages of production and packaging. Giordanino WS ¶ 16. Had a pipe been found to have been defective or non-compliant with the API-5L standards, a report would have been generated and the pipe would not have been marked or sold to Tex-Isle. *Id.* ¶ 18. Respondents submitted to the Tribunal the results of all the tests it performed on the pipes it manufactured for Tex-Isle. *See* Joint Exhibits ("JX") 141, 142, and 143. These results show that the pipes it manufactured passed each of these tests and/or were within the range permitted by API-5L. Giordanino WS ¶¶ 21-24.

### B. Upon Receiving the Pipes, Tex-Isle Traced Them Through to Delivery to End Users

20. The Alessio pipe was delivered to the Port of Corpus Christi in two shipments, one on or about March 6, 2019, and another on or about April 7, 2019. Mejia WS ¶¶ 13, 15. The pipe was subsequently transported to Tex-Isle's George West facility. *Id.*

21. Mr. Alejandro Martinez, Tex-Isle's Director of Quality and Engineering at the time, offered detailed, first-hand testimony on, among other things, the traceability procedures applied by Tex-Isle to the Alessio-produced pipes (and all other pipes received and sold by Tex-Isle).

These traceability procedures are set forth in great detail in JX 82, and, in summary, consist of the following:

- Using information on the bill of lading and the mill stencil on each pipe, Tex-Isle records each pipe in its inventory system.

- When Tex-Isle prepares to coat each pipe, an inventory system transaction is entered to track the movement of the pipe from its storage location to the coating entry line; a Quality Assurance inspector reviews the PO number and heat number on the pipe against Alessio's material test report. The pipe's heat number is recorded on an inbound report as well as written inside the pipe. Two quality assurance and one production employee verify the accuracy of this.

- After coating, the pipe is logged in a production tally with the heat code from inside the pipe. A new stencil is applied on the outside of the pipe listing the PO number, item description, pipe manufacturer, and the heat number. The latter is obtained from the heat code written inside the pipe. With the new stencil in place, pipe identity is maintained. The pipes' location continues to be recorded in the inventory system until delivered to a customer.

*See* 1st Martinez WS ¶ 23 and JX 82. These are the key steps, but there are numerous intermediate steps set forth more fully in JX 82.

22. Mr. Martinez oversaw Quality Management Systems at all Tex-Isle locations, including pipe distribution, fusion bonded epoxy ("FBE") coating, heat treating, non-destructive testing, and threading. 1st Martinez WS ¶ 2. In particular, Mr. Martinez authenticated and explained JX 82, which shows every step in the chain of custody for pipes that failed at EOG Resources ("EOG") (pp. 3-10), Frontier Energy Services, LLC ("Frontier") (pp. 11-18), and LM Energy Partners ("LM Energy") (pp. 19-25). In addition, Mr. Martinez testified to the 96 pages of electronic reports printed from Tex-Isle's inventory system showing every move of all the pipes that are the subject of this arbitration. JX 81; 1st Martinez WS ¶ 24.

23. Mr. Martinez testified that, because of Tex-Isle' traceability system,

> Tex-Isle is able to trace the manufacturer of pipe even after it is sold to end-user customers and installed in underground pipelines based on the stenciling Tex-Isle applies to the pipe after it is coated. Tex-Isle's stenciling processes … are reliable and robust, and they comply with API 5L, API Q1 9th Ed., and ISO 9001 5th Edition.

1st Martinez WS ¶ 25.

24. Mr. Martinez's testimony was uncontroverted, including his testimony that manufacturer traceability is a significant component of Tex-Isle's quality management, and that, as a buyer,

seller and distributor of pipe, it is critical to Tex-Isle's business that it be able to track every piece of pipe that passes through its yards.

### C. Tex-Isle Customers Report Pipe Failures

25. During hydrostatic testing, two Tex-Isle customers —EOG and Frontier—found that one or more Tex-Isle supplied joints burst or leaked at the weld seam. Tex-Isle asserts that these pipes were manufactured by Alessio, while Respondents deny this and argue that the evidence provided by Tex-Isle that they are Alessio pipes is insufficient. Tex-Isle also states that pipes that failed hydrostatic testing at a third customer, LM Energy, were also Alessio pipes. The Tribunal will not address the pipes Tex-Isle supplied to LM Energy because, as Tex-Isle readily admits, those pipes were not purchased subject to the Purchase Order, and therefore are not within the scope of this arbitration.

26. EOG constructs oil and gas pipelines. Witness Statement of Greg Miller ("Miller WS") ¶ 4. On March 11, 2019, EOG ordered 30,000 ft. of 12 ¾" diameter pipe with a .250" wall meeting API Specification 5L. In August 2019, Tex-Isle delivered 5,600 feet of pipe to EOG's Fearless N23 ("Fearless") pipeline. Tex-Isle asserts that almost all of that pipe (5,430 feet) was produced by Alessio pursuant to the Purchase Order. In October 2019, Tex-Isle asserts it delivered a further 7,500 feet of Alessio-produced pipe to EOG's Quijote 2 State ("Quijote") pipeline. Mejia WS ¶¶ 23-24.

27. Once EOG had completed the installation of the pipe Tex-Isle delivered, EOG hydrostatically tested the Fearless pipeline. A Tex-Isle supplied joint split at the seam during testing. That joint bore Tex-Isle's stencil indicating it was a pipe manufactured by Alessio Miller WS ¶ 13. The joint was replaced and the line retested. A second Tex-Isle supplied joint failed during the second test. The failed joint also bore a Tex-Isle stencil indicating it was manufactured by Alessio. Mejia WS ¶ 15. API certified pipe of the size supplied by Alessio should be able to withstand, at a minimum, pressures of 1,842.36 psi before any yielding occurs. Rebuttal Report of Bruce Urband at 3. EOG reported testing the pipes at lower pressures when they failed. Miller WS ¶¶ 13, 15 (stating that the pipes failed at 1500 psi and 1600 psi, respectively).

28. Based on these two failures, EOG abandoned the Fearless pipeline and constructed a parallel line using pipe from a different manufacturer. Miller WS ¶ 16. In addition, EOG decided to abandon the Quijote pipeline and build a new parallel line using pipe from a different manufacturer. Miller WS ¶ 17. EOG did not hydrostatically test the Quijote line. It wrote to Tex-Isle that

> If we were to test the second line and have it pass we should still not feel comfortable flowing hydrocarbons through the line knowing we had multiple failures on material from the same mill produced around the same time, regardless of the exact heat number the proven failures were from. If we did so it would open us up to

> serious and costly liability should a failure eventually occur in that line and cause a leak, property damage, or worse, personal injury or death.

JX 36 (Email dated November 16, 2019, between Greg Miller, Josh Gugenheim, Andy Mejia and others, with the subject line "Fearless N 23 Investigation Protocol").

29. Frontier's business is to store and transport hydrocarbons. Witness Statement of Greg Lamberson ("Lamberson WS") ¶ 4. It constructed a 71-mile Beta Crude Connection ("Frontier") pipeline in Texas. Lamberson WS ¶ 5. On May 6, 2019, Frontier purchased from Tex-Isle 12 3/4" x 0.250" pipe coated with FBE, which Tex-Isle says it fulfilled with Alessio-manufactured pipe. *Id.* ¶ 6. On February 16, 202, Frontier conducted a hydrostatic pressure test on a newly-constructed portion of pipeline. *Id.* ¶ 11. A joint failed along the seam when the test pressure reached 1750 psi. *Id.* That joint bore a stencil indicating that it had been manufactured by Alessio. *Id.* Lamberson WS ¶ 12.

30. Tex-Isle and Frontier agreed that Frontier would remove and replace the Tex-Isle-supplied pipes which bore Alessio stencil markings. Mejia WS ¶ 62; Lamberson WS ¶ 13. Tex-Isle delivered to Frontier 2000 feet of replacement pipe from a different manufacturer on February 27, 2020. A hydrostatic test at 1800 psi was successfully conducted after all the pipes had been replaced. Lamberson WS ¶ 17. Tex-Isle gave Frontier a credit for the $221,093.35 in costs that Frontier stated it had incurred replacing the pipes. Mejia WS ¶¶ 65-66. In addition, Frontier rejected and returned another 1,978.32 feet of Alessio pipe that it had purchased from Tex-Isle, which cost Tex-Isle $46,807.05.

### D. The Parties' Dispute Arises

31. Following the failure of the two joints Tex-Isle had supplied to EOG, Tex-Isle advised Alessio that the failed joints were being sent to a third-party lab for testing to assess the cause of the failure, and suggested that Alessio send a quality assurance representative "to assist in managing these failures." Email from R. Smithey (Tex-Isle) to U. Giordanino (Alessio), dated November 11, 2019 (JX 28). Alessio responded stating, among other things, "we have already verified all the information in the production reports of this heat and have not encountered any anomaly," requesting a sample of the tube as soon as possible. Email from D. Bonetto to R. Smithey, dated November 12, 2019 (JX 28).

32. Tex-Isle responded "We are unable to send a sample of the pipe at this time, as the customer is currently coordinating all testing with a third-party metallurgical lab in Houston, TX to determine the cause of the failure. We think it prudent for an Alessio Tubi representative to be present during the testing." Email from R. Smithey to D. Bonetto, dated November 13, 2019 (JX 28). Alessio responded that "we believe we have the right to examine the product at our laboratory… Obviously your customer is free to go in a laboratory of his choice, but any action must start with our own internal audit and subsequent initiatives previously agreed between the

parties… please send us a sample of the tubes." Email from D. Bonetto to R. Smithey, dated November 13, 2019 (JX 28).

33. On January 22-23, 2020, Alessio representatives traveled to Houston and inspected five pieces of the EOG pipes at the Anderson and Associates Laboratory. U. Giordanino WS ¶ 29. Alessio's representatives could not find any original Alessio markings on the pipe, only Tex-Isle's stencil markings on two of the pieces. U. Giordanino WS ¶ 30. Alessio's representatives told Tex-Isle that without Alessio markings "it is impossible to determine if the pipes were manufactured by Alessio." *Id.* at ¶ 33. Alessio's representatives found it hard to believe that the failed pipe was produced by Alessio due to the absence of any Alessio markings, the fact that non-Alessio pipe had also been used on the pipelines, and because Alessio had pressure tested its pipes successfully in Italy to a pressure higher than the pressure at which it was tested by EOG. *Id.* at ¶¶ 33, 34 and 39.

34. On January 30, 2019, Respondents wrote to Tex-Isle stating that they did not approve of the testing protocol and did not intend to participate any further in Tex-Isle's investigations primarily because the provenance of the pipes could not be determined. JX 49.

35. As Michele Amenduni, the President of both Alessio and Tecnotubi, testified at the hearing, Respondent's position is that "we believe this claim was buil[t] to make us liable for pipes that do not belong to us." Tr. 673:20-21 (Amenduni). "[T]here's no proof that the pipes belong to us. The moment that we receive evidence that the pipes belonged to us, then we pay." Tr. 671:5-8 (Amenduni).

36. In March 2020, Tex-Isle engaged NOV Tuboscope ("Tuboscope") to inspect the weld line of the pipes Tex-Isle contends were manufactured by Alessio by performing a UT weld line inspection test. Mejia WS ¶ 67. Respondents were invited to participate in the process, but Respondents declined. *Id.*

37. The tested pipes included sold and unsold inventory purchased under the Purchase Order that remained in Tex-Isle's possession. Mejia WS ¶ 68. Tuboscope identified defects in the weld line of 261 out of 539 total 16" x .375" joints; 11 out of 39 total 12" x .375" joints; and 252 out of 448 total 12" x .250" joints. Mejia WS ¶ 70.

38. In May 2020, Tex-Isle performed chemical testing on one of the failed Frontier joints, one of the failed LM Energy joints, and a joint from the same heat as the failed EOG joints. Martinez WS ¶ 28. The results showed that the levels of carbon and silicon in the tested joints were similar to the results provided by Alessio in its Mills Report, and dissimilar from the levels of other manufacturers' joints in Tex-Isle's inventory at the time. Martinez WS ¶ 29. In July 2022, Tex-Isle's metallurgical expert, Bruce Urband, commissioned a similar analysis of the nine samples that he had analyzed for his report. The results were similar – *i.e.*, they showed that the carbon and silicon levels of the nine samples were similar to the levels reported by Alessio, and dissimilar to those of the pipes of other manufacturers. Supplemental Expert Report of Bruce Urband, Aug. 12, 2022, pp. 4-5; see also *id.* Appendix B.

39. After the parties' dispute arose, but before Claimant submitted the Demand for Arbitration, Claimant and Toyota entered into an Assignment Agreement on October 28, 2020. Cl. JX 17. The Assignment Agreement provides, among other things, that Toyota "hereby irrevocably assigns unto Tex-Isle all rights, title, and interest that [Toyota] may have or hold as against Alessio and/or Tecnotubi relating to and concerning the Tecnotubi Order and the ERW Steel Pipe sold by Tecnotubi and/or Alessio to" Toyota. *Id.* ¶ 1. The term "Tecnotubi Order" is defined as "certain quantities of ERW Steel Pipe that TAI purchase from Tecnotubi S.p.A. ('Tecnotubi') and/or Alessio Tubi S.p.A. ('Alessio') pursuant to TAI Purchase Order No. 20482387." *Id.* at 1.

## V. PROCEDURAL BACKGROUND

40. On November 11, 2020, Claimant filed a Demand for Arbitration against Respondents.

41. On December 17, 2020, the ICDR appointed Matthew Draper (chair), Lucy Greenwood, and John V.H. Pierce to serve as arbitrators in this case (the "Tribunal").

42. On December 17, 2020, Respondents filed their Answer and Affirmative Defenses to Claimant's Demand.

43. On February 9, 2021, the Tribunal conducted a preliminary hearing with the parties. The next day the Tribunal issued Procedural Order No. 1, which established that, in the interests of efficiency, the Tribunal would determine on a preliminary basis what contract governed the parties' relationship, whether the Tribunal had jurisdiction, and whether an agreement assigning Toyota's claims to Claimant was valid and enforceable. The Tribunal asked the parties to address the following questions:

> A. Which document constitutes the governing contract for the purposes of this arbitration: the Toyota Tsusho America, Inc. Purchase Order No. 20482387 (the "Purchase Order") or the Tecnotubi Contract No. S001.19 (the "Tecnotubi Contract")?
>
> B. What is the effect, if any, of the answer to Issue A on the Tribunal's jurisdiction in this arbitration?
>
> C. Is the assignment agreement between Toyota Tsusho America, Inc. and Tex-Isle Supply, Inc. (attached as Exhibit C to the Notice of Arbitration) valid and enforceable as a matter of law? In answering this question, the parties should identify the law applicable to this question and explain why they believe it applies. To the extent the parties believe that the choice of applicable law depends on the Tribunal's answer to Issue A, the parties should address Issue C on the

> assumption that both the Purchase Order and the Tecnotubi Contract constitute the governing contracts.

Order No. 1 ¶ 1.

44. Respondents jointly filed their opening brief concerning the jurisdictional objection on March 16, 2021 ("Objection"). Claimant submitted its Responsive Brief on April 13, 2021 ("Response"). Respondents then filed a Reply Brief on May 11, 2021 ("Reply"). The Tribunal conducted a hearing with the parties' representatives on May 25, 2021. Present at the hearing were Respondents' counsel, Steven D. Isser, Esq., and Claimant's counsel, William C. Petit, Esq., and Levi Downing, Esq.

45. On July 27, 2021, the Tribunal issued a Partial Final Award on the preliminary questions briefed by the parties. The Tribunal concluded that the Toyota Purchase Order serves as the parties' governing contract, and that the Tribunal therefore has jurisdiction under the arbitration agreement in the T&Cs to determine the parties' disputes. The Tribunal found that there was no purported "acceptance" of the Proposed Tecnotubi Contract" by Claimant pursuant to CISG Article 18(1). Pursuant to CISG Article 19, the Purchase Order constituted both a rejection of the Proposed Tecnotubi Contract and a counter-offer. The Tribunal further concluded that Respondents[1] accepted the Purchase Order by including references to it in subsequent correspondence, and by performing in conformity with the requirements of the Purchase Order. As a result, the Tribunal concluded that the Purchase Order, including the incorporated T&Cs, governs the parties' relationship. Finally, the Tribunal concluded that Toyota assigned to Claimant any rights Toyota had against Respondents under the Purchase Order.

46. The Tribunal reaffirms the Partial Final Award, and incorporates it by reference into this Final Award.

47. On August 23, 2021, the Tribunal conducted a status conference with the parties attended by counsel from both Claimant and Respondents. During the conference, the procedure for the remainder of the arbitration was discussed and determined. The parties agreed that the Commercial Arbitration Rules of the AAA as amended and in effect as of October 1, 2013 would apply. Procedural Order No. 2 ("PO2") ¶ 4. The arbitration is governed by the Federal Arbitration Act, and the laws of the State of New York governs the merits. Id. ¶ 5. Among other things, the Tribunal further established dates and a procedure by which Claimant would provide an accounting for the pipe that was the subject of the dispute, and would provide access to Respondents to inspect the pipe in Claimant's possession. Id. ¶¶ 12-14.

48. The parties then engaged in document disclosure. On December 23, 2021, Respondents submitted a motion to compel the production of certain of Claimant's documents. The parties subsequently resolved all their differences except with regard to the production of Claimant's

---

[1] The Tribunal deferred the question whether Alessio was a proper party to the Purchase Order to this Final Award.

insurance policies, which Claimant resisted. After receiving briefing by the parties, the Tribunal determined that Claimant must produce documents sufficient to show the amount of any payment Claimant had sought or received in connection with any insurance claim related to any claim in the Arbitration. Procedural Order No. 3, dated January 7, 2022, ¶ 5.

49. On July 13, 2022, Claimant sought permission to submit a supplemental expert report describing the chemical analysis on nine pipe samples. Claimant argued it was necessary to respond to Respondents' metallurgical expert, Mr. Antonio Mollo, who had criticized the report of Claimant's metallurgical expert, Mr. Bruce Urband, for having failed to submit a chemical analysis. The procedure did not provide for a surrebuttal, and Respondents opposed. *See* S. Isser Letter dated July 18, 2022. On July 22, 2022, the Tribunal ordered that a surrebuttal report from Mr. Urband would be permitted, and that Mr. Mollo could submit a short reply five weeks later. Pre-Hearing Order No. 4, dated July 22, 2022, at 1.

50. On August 12, 2022, Claimant submitted its Pre-Hearing Memorandum, accompanied by fact and expert witness statements, exhibits, and legal authorities. On September 22, 2022, Respondents submitted their Pre-Hearing Memorandum, also accompanied by exhibits, legal authorities, witness statements and expert reports.

51. On October 14, 2022, the Tribunal conducted a status conference with the parties, addressing the organization of the evidentiary hearing. On October 26, 2022, the Tribunal issued Pre-Hearing Order No. 5 setting out the procedures and rules for the evidentiary hearing, establishing witness order, and resolving certain of the parties' procedural disagreements, including whether the hearing should be held in person or remotely. The Tribunal determined that the hearing should be held in person, subject to certain safety measures to minimize the possibility of the transmission of COVID-19, and that witnesses may testify remotely.

52. On October 21, 2022, both parties submitted evidentiary objections to the Tribunal. The parties submitted replies to the other's objections on October 26, 2022. The Tribunal ruled on the objections at the evidentiary hearing. Claimant's objection was ultimately resolved by the parties. Respondents' objections, concerning evidence of an analysis by Tuboscope and pipes sold to LM Energy, were considered carefully by the Tribunal, but overruled.

53. The evidentiary hearing was conducted on November 7-9 and December 12, 2022, and February 3, 2023. The following witnesses and experts provided testimony and were cross examined at the hearing: Andy Mejia, Greg Miller, Mario Guerra, Greg Lamberson, Bruce Urband, Alejandro Martinez, Michele Amenduni, Daniela Bonetto, Ugo Giordanino, Giovanni Conte, Antonio Mollo, and Maria Varischetti.

54. The parties submitted costs submissions on February 16, 2023. On March 22, 2023, the Tribunal declared the hearings closed.

## VI. THE PARTIES' CLAIMS

55. Tex-Isle claims that Respondents breached the Purchase Order by delivering to Tex-Isle pipe products that did not meet the required specifications—specifically: API-5L 45th Edition in accordance with PSL2 Requirements and Tex-Isle Specification HOU-PUR-STD-004 API-5L PSL2 Rev. 7. Demand ¶ 54. Tex-Isle further claims that Respondents breached the warranties contained in the T&Cs which state that:

> each product shall: (i) be first quality, new production and conform to this Purchase Order in all respects; (ii) conform to all specifications, drawings, samples; descriptions furnished and/or specified by Buyer; (iii) be merchantable and fit for the purpose for which intended; and (iv) be free from all defects in design and workmanship.

Demand ¶ 55 (quoting T&Cs at p. 2).

56. Tex-Isle seeks a declaration that it may "avoid" the Purchase Order because Respondents fundamentally breached the contract pursuant to CISG Article 51. Claimant's Pre-Hearing Brief at p. 73. Tex-Isle also claims damages, including the damages Tex-Isle paid to EOG, its legal fees and arbitration costs, and pre- and post-Award interest. *Id.* at pp. 72-73.

57. Respondents ask that the Tribunal find that Alessio is not a party to the Purchase Order, and that therefore Tex-Isle may not make any claims against Alessio. Respondents' Pre-Hearing Brief at pp. 32-35. Respondents further seek a declaration that neither Tecnotubi nor Alessio breached the Purchase Order or the warranties in the T&Cs. *Id.* pp. 35-36. As a result, Respondents ask for a declaration that Tex-Isle remains bound by the Purchase Order and is not entitled to any damages. *Id.* 36-37. Respondents further argue that any damages to which Tex-Isle may be entitled should be reduced by the amount of any insurance proceeds it received and Tex-Isle is not entitled to attorney's fees. *Id.* 37-38.

## VII. REASONS FOR THE FINAL AWARD

58. For each of its claims, the Claimant bears the burden of persuasion. Thus, Claimant must establish that the preponderance of the evidence entitles it to relief.

### A. Alessio is Not a Party to the Purchase Order

59. The first question we address is whether Respondent Alessio is a proper party to this arbitration. Alessio is not named in the Purchase Order, nor did it sign it. The parties dispute whether Alessio may nevertheless be held liable for breaches of the Purchase Order.

60. The United Nations Convention on Contracts for the International Sale of Goods, 1489 U.N.T.S. 3 (1983) ("CISG") does not speak to this question, so the laws of the State of New York apply. Here, the parties both argue their positions with reference to New York law.

61. Under New York law, "[i]t is well established that, generally, a party who is not a signatory to a contract cannot be held liable for breaches of that contract" except where a nonsignatory is an alter ego of a signatory, or where the nonsignatory "manifested an unequivocal intent to be bound by the contract." *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 396-397 (S.D.N.Y. 2009) (quoting *Rus, Inc. v. Bay Indus., Inc.*, No. 01-CV-6133, 2004 WL 1240578, at *20-21 (S.D.N.Y. May 25, 2004)). Relatedly, "nonsignatories may be held liable for breach of contract, without being 'alter egos,' if their actions show that they are in privity of contract or that they assumed obligations under the contract." *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 397 (S.D.N.Y. 2009) (citations omitted).

62. Tex-Isle argues that three facts show that Alessio expressed an unequivocal intent to be bound by the Purchase Order. First, Tex-Isle argues that Alessio's intent to be bound can be inferred from Ms. Accini's negotiation with Tex-Isle over the terms of the Purchase Order in May and June 2018. Tex-Isle Pre-Hearing Brief ¶ 103 (citing to the email exchange contained in JX 6). However, the Tribunal is not persuaded that these negotiations reflect any such unequivocal intent. Rather, the parties' exchanges show that:

- Ms. Accini represented that she was "in charge of the sales department of Tecnotubi Company" (TEX-0000339);
- Ms. Accini's "definitive offer" provided that the "supplier" of the pipes is "Tecnotubi S.p.A." (TEX-0000324); but
- Ms. Accini sent to Tex-Isle a sample of Alessio's API 5L certificate because, she indicated, of the Grupo Amenduni companies, only Alessio "can produce AP 5L/5CT pipes because they have the valid certification." (TEX-0000320)

From these exchanges, the Tribunal discerns no unequivocal intention of Alessio to be bound by the subsequent Purchase Order.

63. Second, Tex-Isle argues (from the exchanges in JX 6), that Tecnotubi could not have entered into the Purchase Order "unless Alessio had agreed to manufacture the pipe," and that these circumstances "demonstrate that Alessio intended to be bound." Tex-Isle Pre-Hearing Br. ¶ 104. The Tribunal is also not persuaded by this argument. To the contrary, this chain of events demonstrates that Tex-Isle understood that the "supplier" of the pipes was Tecnotubi, but that the "producer" was Alessio. Nevertheless, in September 2018 Tex-Isle caused its agent Toyota to send to Tecnotubi the Purchase Order which only named Tecnotubi. This indicates that the mutual understanding of Tex-Isle and Tecnotubi was that Alessio was not a party to that Purchase Order.

64. Third, Tex-Isle argues that Alessio "assumed obligations under the" Purchase Order. Tex-Isle Pre-Hearing Br. ¶ 105. The Tribunal does not agree. In fact, the evidence that Tex-Isle

cites indicates that Alessio acted more like a subcontractor to Tecnotubi, entering into a separate agreement whereby it "paid Alessio for the production, withholding a brokerage fee." *Id.*, (quoting Amenduni WS ¶ 13).

65. A helpful counter example of a non-signatory expressing unequivocal intent to be bound to a contract is in the *MBIA* case relied upon by both parties. There the court summarized the reasoning of a sister court in the case *Rus, Inc. v. Bay Indus., Inc.*, No. 01-CV-6133, 2004 WL 1240578, at *20-21 (S.D.N.Y. May 25, 2004), which found that a nonsignatory "manifested an intent to be bound when it communicated with the plaintiff about the sale and marketed the sale, and when ***the parent's negotiator testified that he intended the parent to be bound by the contract***." *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 397 (S.D.N.Y. 2009) (emphasis added). Here, we have no statement from Alessio that comes close to suggesting that it intended to be bound to the Purchase Order.

66. The Tribunal concludes that the words and deeds of nonsignatory Alessio cited by Tex-Isle do not manifest an "unequivocal intent" to be bound by the Purchase Order. The Tribunal therefore determines that Alessio is not a party to the Purchase Order or, by extension, to the applicable arbitration clause found in the T&Cs.

### B. The Pipe That Tex-Isle Contends Alessio Manufactured Was Defective

67. The next question we address is whether the pipe that Tex-Isle contends Alessio manufactured was defective. We conclude that it was. Indeed, the evidence overwhelmingly demonstrates that the joints that Tex-Isle recorded in its inventory system (and stenciled) as having been produced by Alessio pursuant to the Purchase Order were defective. The investigation by Viking Engineering of the EOG failed pipes concluded, among other things, that the fusion line of the pieces of pipe it inspected do "not meet API 5L requirements or the Tex-Isle purchasing specification." JX 117 at p. 16. Viking further found that "the line pipe does not meet API 5L requirements for maximum flaw depths of 10% for EQ line pipe and also exceeds the 10% wall thickness tolerance." *Id.* Claimant's metallurgical expert, Bruce Urband, conducted an exhaustive assessment of a representative sample of rejected pipes, and similarly concluded that they did not comply with API 5L requirements. First Report of B. Urband p. 14. Respondents' metallurgical expert, Antonio Mollo, agreed that the samples Mr. Urband inspected came from "a poorly managed process." JX 160 at 4313. Mr Mollo called the Viking report "a good report." Hearing Tr. 895:2-9.

68. Tecnotubi and its expert, Ms. Varischetti, criticize the pressure tests conducted by EOG and Frontier for testing the pipes at a wrong (and higher) pressure. Varischetti Report ¶ 4. But the evidence shows that EOG tested the failed pipes at lower than the API 5L specification. Miller WS ¶¶ 13, 15. Moreover, Ms. Varischetti agreed at the hearing that the pipes should have been able to withstand pressures of over 2000 psi. Hearing Tr. 938:4-939:20.

69. We note as well that Daniela Benetto, Alessio's sales director, testified under cross examination that "***I am not questioning the presence of defects on the pipes***. I am just saying that the pipes in question are not ours." Hearing Tr. 704:19-22.

70. The Tribunal concludes, therefore, on the basis of all of the fact and expert evidence, that the pipes that Tex-Isle contends Alessio manufactured were defective.

### C. The Defective Pipe Was Manufactured By Alessio

71. We next turn to the key issue in dispute between the parties, which is whether Tex-Isle has established its burden of proving that the defective and failed pipes were, in fact, manufactured by Alessio. For the reasons that follow, we conclude that it has.

72. The Respondents have set out a series of reasons why they say they are unable to accept that the defective pipes were manufactured by Alessio. We have carefully considered each of these reasons. First, the Respondents note that, when Tex-Isle coated the pipes, it removed the markings that Alessio had originally placed on the pipes, thus removing a critical identifier that would have proved the provenance of the pipes. Michele Amenduni, the President of both Alessio and Tecnotubi, testified at the hearing that

> when a company applies a coating of paint, and removes the marking, it removes the most important element, the most important part that identifies the piece, and when a problem occurs, like this one or others, they can -- you cannot say that there's a generic general internal procedure that proves this, because it cannot be opposed to third parties, the procedure. Because in my idea, this is my personal opinion, any company that is making coating or any kind of painting should have every production batch certified by an external entity, because by removing the marking, they do something that will create problems in identifying the product.

Hearing Tr. 680:2-21 (Amenduni). Mr. Amenduni went on to say:

> …. For example, when you start manufacturing and you can involve a third party, an independent entity and certify that this batch belongs to that manufacturer before I remove the marking. But that specific production batch, not a general and generic certification for the whole year, that the procedure works, because the documents, the internal documents of a company can be changed, can be built as one wants.

Tr. 679:3-15 (Amenduni)

73. Mr. Amenduni said that "we believe this claim was buil[t] to make us liable for pipes that do not belong to us." Tr. 673:20-21 (Amenduni). "[T]here's no proof that the pipes belong to us. The moment that we receive evidence that the pipes belonged to us, then we pay." Tr. 671:5-8 (Amenduni).

> Q: Is it your position that the only acceptable proof that Alessio manufactured the pipes is to see the visible Alessio markings that were initially on the pipe?
>
> A. That's for sure the first thing. …

Tr. 673:22-674:14 (Amenduni).

74. While we agree that the presence of Alessio's original markings on the pipe would be dispositive, we are not ultimately persuaded that the absence of Alessio's original markings necessarily means that one cannot establish that the pipes were manufactured by Alessio. After all, Respondents were aware that the pipes they were manufacturing would need to be coated, (see e.g., JX 6 (Email from C. Kayem (Tex-Isle) to M. Accini (Tecnotubi), dated May 28, 2018 (TEX-0000329)), and they were also aware that the coating process would necessarily require the replacement of Alessio's original markings for a stencil applied to the coated pipe. So, we do not believe it reasonable to require Alessio's original markings as the only acceptable proof that the pipes were, in fact, manufactured by Alessio.

75. Second, Respondents, understandably, find it hard to believe that Alessio produced pipes that did not meet API Specification 5L, and which failed so catastrophically, given the quality assurance process in place in Alessio's manufacturing facilities. The quality assurance processes and testing in place at Alessio, which Respondents fully documented in this arbitration, appear to the Tribunal to be robust. *See* § IV(A), above. In addition, Alessio is regularly audited by API in order to maintain its API certification. Moreover, Tex-Isle's Quality Assurance Manager at the time, Mr. Martinez audited Alessio's production facility in November 2018 and found its quality management system to be "mature and well developed." Email from A. Martinez to Tex-Isle management, dated Nov. 26, 2018 (Respondents Ex. 24). Mr. Martinez concluded "I don't have any concerns about the quality of the equipment for making Line Pipe at this mill." *Id.* Most importantly, Respondents produced the documentation showing the successful results of the tests that it performed on the pipes Tecnotubi delivered to Tex-Isle. Giordanino WS Exhibits 5 6, 7, 8.

76. This evidence, taken together, does weigh in favor of the Respondents' position that the pipes that it manufactured were not defective. But the Tribunal must balance this evidence against the evidence adduced by Tex-Isle which weighs in favor of a finding that the defective pipe was indeed manufactured by Alessio, notwithstanding its internal quality assurance processes.

77. Most important from the Tribunal's perspective is the evidence of Tex-Isle's traceability procedures. As described above, these procedures require that pipes acquired by Tex-Isle be identified and logged into the inventory system from the moment they arrive at Tex-Isle's facility. This logging procedure is repeated every time they are moved, including numerous times throughout the coating process, and thereafter. *See* § IV(B), *supra*. The Tribunal has carefully considered Tex-Isle's traceability procedures, and the uncontroverted evidence adduced by Tex-Isle of the care, precision and redundancy with which it maintained the identity of Alessio's pipes in its possession, and finds this evidence to be compelling.

78. Respondents have not identified any credible reason to doubt Tex-Isle's traceability procedures or any credible explanation as to how the pipes at issue could have been confused with pipes from another manufacturer. Tex-Isle has adduced credible testimony that only one producer's pipes are put through the coating process at any given time, and that the stencil that is placed on the pipes after the coating process are derived from a detailed log prepared just before the coating process begins. The evidence in the record before the Tribunal does not include anything that, in the Tribunal's view, provides a reasonable basis to doubt the integrity of the traceabilty process at Tex-Isle.

79. In light of this, it is highly significant and probative that the joints that failed EOG's and Frontier's hydraulic pressure testing were stenciled by Tex-Isle with "Alessio" and the Purchase Order number. *See* ¶¶ 27, 29, above. The chances that these stencils were somehow applied in error, given the traceability procedures described by Tex-Isle, appear to the Tribunal to be exceedingly remote.

80. We note as well that the Tuboscope testing demonstrated that roughly half of all joints in Tex-Isle's yard that Tex-Isle recorded as having been manufactured by Alessio possessed defects in the weld line. *See* ¶ 36, above. In addition, the chemical analysis of the faulty pipes when compared to the pipes that Alessio allegedly supplied appear to show a strong match, at least with regard to non-trace components carbon and silicon. *See* ¶ 37, *supra*. It is true, as Respondents point out, that some other components of the pipes appear inconsistent with the make-up recorded in Alessio's Mill Report. Respondent's Pre-Hearing Br. pp. 26-29. But these components are present in much smaller quantities and are therefore less reliable markers.

81. When all of the evidence in the record is considered together, we find that Tex-Isle has met its burden of establishing that the defective pipe was indeed manufactured by Alessio. We recognize that this must mean that there was a failure in some aspect of Alessio's quality assurance process, whether human or otherwise, but we simply see no credible basis to contest the strong evidence adduced by Tex-Isle that the pipe in question had to have been manufactured by Alessio. Accordingly, the Tribunal finds that the preponderance of the evidence establishes that the pipes identified by Tex-Isle as being produced by Alessio, were in fact produced by Alessio.

### D. Tecnotubi Breached the Purchase Order

82. As noted, the laws applicable to the merits of the dispute are the laws of the State of New York. T&Cs, p.3. Tex-Isle also suggests that the CISG applies. Tex-Isle Pre-Hearing Br. ¶ 98. In any case, New York law and the CISG are in accord that, to establish breach of contract, a plaintiff must show "(1) the existence of a valid and enforceable contract containing both definite and certain terms, (2) performance by plaintiff, (3) breach by defendant and (4) resultant injury to plaintiff." CLA 15, *Ningbo Yang Voyage Textiles Co. v. Sault Trading*, 18-CV-1961 (ARR) (ST), 2019 U.S. Dist. LEXIS 155405, at *7-8, 2019 WL 5399973 (Sept. 10, 2019).

83. Here, the Tribunal has found that the Purchase Order is a valid and enforceable contract. *See* Partial Final Award. It is not disputed by Tecnotubi that Tex-Isle performed the Purchase Order. Tex-Isle Pre-Hearing Br. ¶ 106.

84. As set forth in Section VII(B), above, the pipes supplied by Tecnotubi were defective and breached the express terms of the Purchase Order, which required that they meet the API Specification 5L standards, or the warranties contained in the T&Cs incorporated by reference into the Purchase Order, including that they be fit for the intended purpose and free of defects:

> WARRANTY. In addition to any other warranties provided by law or otherwise, that the pipe "shall (i) be first quality, new production and conform to [the] Purchase Order in all respects; (ii) conform to all specifications, drawings samples, descriptions furnished and/or specified by Buyer; (iii) be merchantable and fit for the purpose for which [the goods are] intended; and (iv) be free from all defects in design and workmanship.

T&Cs at TEX-0001528.

85. The Tribunal therefore concludes that Tecnotubi breached the Purchase Order by supplying pipes to Tex-Isle that were defective and/or did not meet the API Specification 5L standards and warranties required by the Purchase Order. This is a fundamental breach pursuant to Article 25 of the CISG, entitling Tex-Isle to cancel the Purchase Order.

### E. Tecnotubi Is Liable for Tex-Isle's Foreseeable Damages

86. Having determined that Tecnotubi breached the Purchase Order, the Tribunal now turns to the question of whether Tex-Isle may recover damages from Tecnotubi to compensate it for that breach. The T&Cs incorporated in the Purchase Order provide for specific remedies, in addition to all those available at law, for breach:

> In the event of a breach of warranty, ***in addition to all other remedies hereunder or under applicable law or in equity***, Buyer

> may: (i) cancel all or any portion of this Purchase Order; (ii) require the Seller to repair or replace any or all Products, at Buyer's option and at Seller's sole expense; (iii) return nonconforming Products to Seller and request that Seller investigate the nonconformity and submit an action plan to Buyer to correct the nonconformity in a timely manner, at Seller's sole cost and expense; (iv) require the Seller to pay all transportation and other charges arising from delivery, storage or return of Products; and/or (v) purchase replacement Products from a Third Party and charge the same to Seller.

T&Cs at p. 3. Respondents agree that, in case of Tecnotubi's breach, this provision entitles Tex-Isle to things like transportation costs, the cost of "replacement of [defective] pipes, storage costs, [and] testing costs." Respondent Pre-Hearing Br. p. 37; Tr. 66:2-6 (Isser).

87. But this provision is more sweeping, in at least two respects. First, in the event of any breach of the Purchase Order, Tex-Isle may cancel "all" of the Purchase Order and/or, Tex-Isle may require Tecnotubi to replace "all Products, at Buyer's option and at Seller's sole expense." T&Cs at p. 3. "Products" is defined as the "goods or services covered by the Purchase Order." *Id.* at p. 1. Thus, the parties' contract contemplates that a defective pipe would entitle Tex-Isle to demand that Tecnotubi replace all pipes, whether they were defective or not.

88. Second, this provision makes clear that its remedies are "in addition to all other remedies hereunder or under applicable law or in equity." *Id.* at p. 3. Here, Article 74 of the CISG and New York law both provide that non-breaching parties are entitled to damages equal to their foreseeable losses:

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

CISG Art. 74; *see also* CLA 6, *Delchi Carrier Spa v. Rotorex Corp.*, 71 F.3d at 1029-30.

89. Tex-Isle sets forth in its Pre-Hearing Brief § X.(A.)., quantification of six heads of damages that it claims it incurred due to Tex-Isle's breach of the Purchase Order. Tex-Isle correctly deducts from its claimed damages by the amount it mitigated them by selling some of the Alessio pipe in its possession as non-API 5L pipe to a third party for $638,883.00. Tex-Isle Pre-Hearing Br. ¶ 95 and CX 95. Net of this mitigated amount, Tex-Isle seeks damages of $3,424,320.29, plus interest.

90. Of Tex-Isles' six categories of damages, Tecnotubi does not contest five:

1. Tuboscope weld line inspection costs - $156,827.90
2. Rejected pipe (from Tex-Isle customers) - $974,234.50
3. Steel pipe rejects (by Tex-Isle upon visual inspection at time of deliver) - $12,456.46
4. Storage costs - $294,163.69
5. Costs incurred due to the Frontier failure - $272,797.40

91. Tecnotubi neither challenges the availability of these five heads of damages, nor does it challenge the particular amounts of damages Tex-Isle seeks for each category.

92. Nevertheless, Claimant is required to prove its damages with reasonable certainty. For each of these categories of damages Tex-Isle offers sworn witness statements, attaching receipts and other supporting documentation. Tecnotubi does not contest the amount of damages that Tex-Isle seeks for each of these categories. The Tribunal has independently reviewed the proof offered by Tex-Isle of its losses, and finds the amounts claimed by Tex-Isle to be reasonable and supported by the record.

### F. Damages Stemming from Tex-Isle's Settlement with EOG

93. Tecnotubi contests Tex-Isle's sixth category of damages: the $2,352,723.34 in damages for the replacement of EOG's Fearless and Quijote pipelines with non-Alessio pipes.[2] Tecnotubi argues that Tex-Isle has not identified "any case, or provision of the CISG, which demonstrates that Claimant is entitled to damages concerning the installation of the parallel pipelines by EOG." Respondent's Pre-Hearing Br. p. 37. Tecnotubi argues that it was unreasonable and "not foreseeable" that EOG would abandon the pipelines and build two parallel pipelines based solely on two failed pipes and "without even testing the Quijote Pipeline." *Id.*

94. We address each of Tecnotubi's arguments in turn. First, we note that Tex-Isle has identified, among other provisions, CISG Article 74, which, as discussed above, provides that damages for breach are equal to the losses "which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract." Here, the record establishes that Tecnotubi knew at the time of the conclusion of the contract that the pipes would be coated and used to transport oil and gas. The Purchase Order specified API Specification 5L. Importantly, during contract negotiations, Tex-Isle told Tecnotubi that "[w]e will be coating this pipe with FBE and will be selling to upstream and midstream oil and gas companies for gathering and transportation lines." Email from C. Kayem (Tex-Isle) to M. Accini (Tecnotubi), dated May 28, 2018 (JX-6) (TEX-0000329).

95. The question, therefore, is whether it is foreseeable that an oil and gas transportation company would reasonably abandon entire pipelines if two joints failed and a significant number

---

[2] This updated amount of losses in relation to the EOG failure was presented at the Evidentiary Hearing.

of joints are subsequently found to be defective. Tex-Isle argues that such damages are both foreseeable and reasonable:

> [I]t was, or should have been, foreseeable that producing and selling to Tex-Isle line pipe that did not conform with Tex-Isle Specifications and API Specification 5L, and that contained significant weld line defects, among others, would cause end-users to experience line pipe failures, require replacement of the defective Alessio-manufactured pipe, and, given the significant risks posed by using defective line pipe, that Tex-Isle could not sell the subject pipe as API Specification 5L pipe, and end-users would not trust or use, the subject pipe.

Claimant Pre-Hearing Br. ¶ 127.

96. Mr. Miller of EOG explained the basis for EOG's decision to replace the pipelines in a contemporaneous email to Tex-Isle:

> If we were to test the second line and have it pass we would still not feel comfortable flowing hydrocarbons through the line knowing we had multiple failures on material from the same mill produced around the same time, regardless of the exact heat number the proven failures were from. If we did so it would open us up to serious and costly liability should a failure eventually occur in that line and cause a leak, property damage, or worse, personal injury or death.

JX 36 (Email dated November 16, 2019, between Greg Miller, Josh Gugenheim, Andy Mejia and others, with the subject line "Fearless N 23 Investigation Protocol"). Mr. Miller testified on Day 1 of the evidentiary hearing, and counsel for Tecnotubi cross examined him at length. However, no questions were asked about the reasonableness of EOG's decision to abandon the pipelines.

97. The Tribunal finds it would have been foreseeable at the time of contracting that, were Tecnotubi-supplied pipes to fail under testing in the field, and thus confirm the presence of widespread defects and a failure to meet the required specifications, this would justify replacement of all such pipes. Tuboscope found that roughly half of the joints still in Tex-Isle's possession were faulty. The potential liability and reputational damage that EOG (and Tex-Isle) would face from a pipeline failure could be significant if an operating pipeline were to rupture. In addition, the fact that all of the failed pipes burst along the weld seam, and that further investigations by Viking and Mr. Urband identified what appear to be systemic problems with the pipe's seams, could reasonably lead customers like EOG to decide to reject all pipes provided by Tecnotubi, regardless of whether a defect is detectable. The fact that the remedies for breach of warranty provision in the T&Cs contemplates the possibility of all pipe being rejected even where not all is found to be defective (T&Cs p. 3) indicates that the parties understood there

were scenarios in which all pipe, including pipe with no detectible flaws, would need to be replaced.

98. One concern that the Tribunal has identified, but which was not addressed by either party, is whether losses suffered not directly by Tex-Isle, but by the end user of the pipes, can be claimed by Tex-Isle under the Purchase Order. The T&Cs do not expressly address this situation. However, the Tribunal considers that because Tex-Isle informed Tecnotubi that it would resell the pipes on to end-users, that it was foreseeable that Tex-Isle may incur liability for losses third parties incurred for defective pipes. Moreover, there was unchallenged testimony on Tex-Isle's settlement agreement with EOG, and the settlement agreement itself has been entered into evidence. The Tribunal considers that Tex-Isle entered into the Settlement Agreement not knowing whether it would prevail in this arbitration, and therefore had an incentive to critically examine EOG's claimed damages. But perhaps most important to the Tribunal is the fact that some 800 pages of supporting documents justifying EOG's claimed losses have been submitted in this arbitration. Tecnotubi therefore had the opportunity to review these supporting documents and question Mr. Miller and Tex-Isle's witnesses about them. Tecnotubi declined to do so. The Tribunal has itself reviewed these supporting documents. The Tribunal finds the evidence of EOG's (and therefore Tex-Isle's) loss to be sufficient. Finally, the Tribunal finds it notable that Tecnotubi has not challenged the suggestion that it could be liable for losses incurred by third party end users. In particular, it does not challenge the idea that it might be responsible for Frontier's losses for any reason other than Tecnotubi's allegation that the pipes were from a different manufacturer. Likewise, Tecnotubi challenges its liability for EOG's losses only on the bases of foreseeability and reasonableness, but not on the basis that such damages are too remote or have not been adequately proven.

99. It is a close question as to whether the losses for the Quijote Pipeline claimed by Tex-Isle and for which Tex-Isle agreed to compensate EOG were foreseeable at the time Tecnotubi entered into the Purchase Order. EOG never tested the Quijote Pipeline. The Tribunal does not question EOG's decision to abandon that pipeline based on the testing of the Fearless pipeline as a matter of commercial reasonableness. But that is not the legal test we must apply. The question for this Tribunal is whether it was reasonably foreseeable to Tecnotubi at the time of contracting that it would be liable for the full replacement cost of a pipeline that was never hydrostatically tested, simply because some joints from the same heat used in that pipeline had been found to be defective in another pipeline. On balance, the Tribunal finds that the replacement of the entire untested Quijote pipeline was not reasonably foreseeable, and that therefore Tecnotubi cannot be held liable for those costs.

100. For the foregoing reasons, Tex-Isle is entitled to recover for the damages it incurred when it settled with EOG over EOG's losses caused by the Alessio pipes, excluding the losses claimed in relation to the Quijote Pipeline. Tex-Isle seeks to be compensated for the following EOG losses: (1) the original cost of the Alessio pipes used in the pipelines ($336,000), (2) the cost of constructing a parallel Fearless line ($695,000), (3) the cost of constructing a parallel Quijote line ($878,000), and (4) the amount EOG paid for 17,038 feet of Alessio pipe that it never used

($443,000). Miller WS ¶ 28.[3] To both refund EOG for its purchase of the Alessio pipes and reimburse it for the costs of constructing the replacement Fearless Pipeline would result in a windfall for EOG. At the end of the day, EOG would have a pipeline for which it never had to pay for any pipe. At the same time, while Tex-Isle is not entitled to reimbursement for the full replacement costs of the Quijote Pipeline, the Tribunal finds it is entitled to reimbursement for the cost of the 24 Alessio pipes used in the Quijote Pipline. Thus, Tribunal finds that of the $336,000 that Tex-Isle seeks for EOG's purchase price for the Alessio pipes from Tex-Isle, Tex-Isle is entitled to the costs of the pipes for the Quijote Pipeline – or $62,511.63

101. With these reductions, Tex-Isle is awarded $1,201,234.97 in damages in relation to EOG.

**G. Tex-Isle's Damages Are Reduced by the Amount of its Insurance Recovery**

102. The only other aspect of Tex-Isle's damages claim that Tecnotubi challenges concerns the insurance proceeds of $233,831.52 that Tex-Isle has received in relation to the Alessio pipes. Tecnotubi argues that the "collateral source" rule does not apply under New York law in breach of contract cases. Respondents' Pre-Hearing Br. pp. 37-38. Tecnotubi cites a New York Court of Appeals case, *Inchaustegui v. 666 5th Ave. Ltd. Partnership*, 96 N.Y.2d 111 (2001) (RLA 6)., which declares:

> Under settled contract principles, however, the [plaintiff] is entitled to be placed in as good a position as it would have been had the [defendant] performed. Its recovery is limited to the loss it actually suffered by reason of the breach. Contrastingly, the common-law collateral source rule is inherently a tort concept. It has a punitive dimension that does not comport with contract law. Contract damages, unlike tort damages, are limited to the economic injury caused by the breach.

*Inchaustegui*, 96 N.Y.2d at 116 (quotations and citations omitted).

This proposition is broadly stated and appears on its face to apply to all actions for contract damages governed by New York law. Claimant is correct that there are some lower courts and Federal Courts, applying New York law, that have limited the holding in *Inchaustegui* to cases concerning breaches of contractual provisions that require insurance. *See 515 Ave. I Corp. v. 515 Ave. I Tenants Corp.*, 920 N.Y.S.2d 240 (N.Y. Gen. Term 2010) *Ventura Assocs. v. Int'l Outsourcing Servs.*, No. 04 Civ. 5962 (PKL), 2005 U.S. Dist. LEXIS 13991, at *22 (July 12, 2005) (applying New York law) (CLA 24); *see also Ocean Ships, Inc. v. Stiles,* 315 F.3d 111, 114 (2d Cir. 2002) (CLA 17); *Elias Props. E. Setauket v. Kohl's Dep't Stores*, No. 04-CV-1274 (JS) (MLO), 2006 U.S. Dist. LEXIS 112073, *14 (E.D.N.Y. June 13, 2006). Nonetheless, the New York Court of Appeals is the highest court in New York, and its decision in *Inchaustegui* on this

[3] The sum of these figures is $732.34 less than the amount Tex-Isle sought at the close of the evidentiary hearing. Tex-Isle has not established an entitlement to the additional $732.34, and so it is excluded from Tex-Isle's damages.

matter of New York law is clear and unequivocal. The Tribunal finds, therefore, that the collateral source rule does not apply, and the therefore that Tecnotubi's liability must be reduced by the $233,831.52 insurance proceeds Tex-Isle received.

**H. Interest**

103. AAA Rule R-47(d)(i) authorizes the Tribunal to award interest from the date and at the rate it deems appropriate.

104. The Tribunal considers it appropriate to award Tex-Isle interest on its damages. The interest will run from the date the damages were incurred, until the date of this Final Award. Thus, interest will run on Tex-Isle's damages from the Frontier and EOG failures from the dates it paid those amounts to Frontier (April 22, 2020; JX 64) and EOG (October 28, 2022; Claimant Hearing Exhibit 10; Hearing Tr. 94:2-96:6 (Mejia)). The costs associated with the NOV Tuboscope inquiry were due and paid by October 14, 2020 (Mejia WS Exhibit 76). Interest on the damages from the unsold and undelivered Alessio pipe it purchased under the Purchase Order shall run from the date of the Frontier pipe failure, February 16, 2020. Lamberson WS ¶ 11. This is the appropriate date because at this time Tex-Isle suspected (correctly, as it turned out) that there may be widespread problems with Alessio pipes, and shortly thereafter engaged Tuboscope to inspect all of their weld lines. Mejia WS ¶ 67. Interest on the damages from the pipe Tex-Isle rejected due to visual inspections upon delivery runs from the final rejection date of August 27, 2019. Mejia WS Ex. 77. No interest shall run on Tex-Isle's storage costs, which are charged monthly.

105. The interest rate shall be the average U.S. Prime Rate compounded annually. Historical U.S. Prime Rate are found here. https://www.jpmorganchase.com/about/our-business/historical-prime-rate. The average rate between August 2019 to May 2019 is 6.07%. The U.S. Prime Rate is appropriate because it is a market-based estimate of borrowing costs.

| Category Of Damages | Damages | Date From Which Interest Runs | Interest Due As Of The Final Award |
|---|---|---|---|
| Frontier Failure | $272,797.40 | 4/22/2020 | $54,355.40 |
| EOG Failure | $1,201,234.97 | 10/28/2022 | $42,010.73 |
| NOV Tuboscope | $156,827.90 | 10/14/2020 | $25,787.53 |
| Rejected pipe | $335,351.50[4] | 2/16/2020 | $70,788.82 |
| Steel pipe rejects | $12,456.46 | 8/27/2019 | $2,853.31 |
| Storage Costs | $294,163.69 | N/a | 0 |

4 Total rejected pipe damages of $974,234.50 minus the Tex-Isle mitigation of $638,883 is $335,351.50.

| | | | |
|---|---|---|---|
| **Total** | **$2,272,831.92** | | **$195,795.79** |

106. The sum of Tex-Isle's damages, plus interest, and minus Tex-Isle's insurance recovery, is $2,234,796.19.

**I. Legal Fees and Costs; Costs of the Arbitration; AAA/ICDR Fees; Arbitrator Compensation**

107. This Tribunal is authorized to allocate attorneys fees only if requested by both parties, or authorized by law or the arbitration agreement. AAA Rule R-47(d)(ii). Here, none of these conditions are met. Respondents do not seek attorneys fees. *See* Respondents' Cost Submission, dated February 16, 2023, p. 1. New York law does not provide for recovery of attorney's fees by the prevailing party. *See e.g.*, *Evemeta, LLC v. Siemens Convenience Creators Corporation*, 173 A.D.3d 551, 553 (1st Dep't 2019) (RLA 8). The parties' contract does not authorize the shifting of attorneys fees. Respondents' Pre-Hearing Br. p. 38. Tex-Isles request for an award of its attorneys fees is, therefore, denied.

108. AAA Rule 47(c) authorizes the Tribunal to allocate the AAA/ICDR's fees (R-53), arbitrator compensation (R-55), and the costs of the arbitration (R-54), as it "determines is appropriate." The Tribunal, considers it appropriate to allocate such costs to Respondent Tecnotubi because it did not prevail in this arbitration. Thus, Tex-Isle is entitled to an award of $18,975.00 (AAA administrative fees); $262,300.82 (tribunal compensation and expenses); and $107,257.27 (Tex-Isle's arbitration costs). *See* Claimant's Submission on Costs and Attorneys Fees, dated February 16, 2023, at p. 6.

## VIII. FINAL AWARD

For the foregoing reasons, the Tribunal enters a Final Award as follows:

1. Alessio Tubi S.p.A. is not a party to the contract or arbitration agreement, and therefore is not a proper party to this arbitration.

2. Within thirty (30) days from the date of transmittal of this Final Award to the Parties, Tecnotubi S.p.A., hereinafter referred to as Tecnotubi, shall pay to Tex-Isle Supply, Inc., hereinafter referred to as Tex-Isle, the sum of $$2,234,796.19 in damages and interest.

3. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$18,975.00 shall be borne by Tecnotubi, and the compensation and expenses of the arbitrators totaling US$262,300.82 shall be borne by Tecnotubi. Therefore, Tecnotubi shall reimburse Tex-Isle the sum of US$150,125.42.

4. Tecnotubi shall also reimburse Tex-Isle the sum of $107,257.27 for Tex-Isle's other arbitration costs.

5. Any of the above amounts not paid within thirty (30) days from the date of transmittal of this Final Award shall be subject to U.S. Prime Rate of interest, compounded annually.

6. The Tribunal declares that Tex-Isle may avoid the Purchase Order in its entirety.

7. The Tribunal has considered all arguments and evidence submitted by the Parties even if not specifically discussed herein.

8. This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration.

9. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

31 May 2023 — Matthew Draper

Dated — Matthew E. Draper, Arbitrator

Dated — Lucy Greenwood, Arbitrator

Dated — John V.H. Pierce, Arbitrator

I, Matthew E. Draper, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

31 May 2023 — Matthew Draper

Dated — Matthew E. Draper, Arbitrator

I, Lucy Greenwood, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

Dated — Lucy Greenwood, Arbitrator

I, John V.H. Pierce, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

Dated — John V.H. Pierce, Arbitrator

Dated — Matthew E. Draper, Arbitrator

31 May 2023 — [signature]

Dated — Lucy Greenwood, Arbitrator

Dated — John V.H. Pierce, Arbitrator

I, Matthew E. Draper, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

Dated — Matthew E. Draper, Arbitrator

I, Lucy Greenwood, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

31 May 2023 — [signature]

Dated — Lucy Greenwood, Arbitrator

I, John V.H. Pierce, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

Dated — John V.H. Pierce, Arbitrator

Dated — Matthew E. Draper, Arbitrator

Dated — Lucy Greenwood, Arbitrator

31 May 2023

Dated — John V.H. Pierce, Arbitrator

I, Matthew E. Draper, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

Dated — Matthew E. Draper, Arbitrator

I, Lucy Greenwood, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

Dated — Lucy Greenwood, Arbitrator

I, John V.H. Pierce, the duly appointed Arbitrator in the above matter, do hereby affirm upon my oath as Arbitrator that I am the individual in and who executed the award and that the annexed is a true and correct copy of my Final Award in the above matter.

31 May 2023

Dated — John V.H. Pierce, Arbitrator